## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                        :

ALBANIAN ASSOCIATED FUND and    :
IMAM ARUN POLOZANI,              :        Civil Action No.  06-cv-3217 (PGS)
                        :
                        :
                        :
          Plaintiffs,     :             **OPINION**
                        :
          v.              :
                        :
THE TOWNSHIP OF WAYNE and THE  :
TOWNSHIP OF WAYNE PLANNING   :
BOARD,                      :
                        :
          Defendants.    :
_____:

**SHERIDAN, U.S.D.J.**

      This matter comes before the Court on a motion for summary judgment by defendant and a motion for partial summary judgment by plaintiff.   For the reasons stated below, both motions are denied in their entirety.

      Plaintiff, Albanian Associated Fund (collectively with Imam Arun Polozani referred to as "plaintiffs" or "the Mosque"), is an entity created for the purpose of establishing and maintaining a Mosque and to provide a place of public worship and prayer in accordance with the traditions of the Islamic religion.  Currently, the congregation convenes at a facility located on River Street in Paterson, New Jersey.  That property, purchased by plaintiffs in 1985, houses a 3,000 square foot facility that accommodates approximately 70 to 100 individuals.  Over the years, the Mosque's congregation grew to approximately 200 families, 70% of which reside in the Township of Wayne

(collectively with the Township of Wayne Planning Board referred to as the "Township").

According to the Imam, the current facilities are considered by plaintiffs to be inadequate because:

> [t]he hall is not large enough to allow both men and women to pray; women are required to pray in the basement where they cannot face Mecca or see the Imam as is required by the religion; the women cannot engage in cleansing, a requirement for prayers; women could not participate in the holiday activities; the Mosque cannot offer youth activities; and funerals cannot be held at the Mosque.

As a result, on September 6, 2001, plaintiffs entered into a contract for the purchase of property known as Block 3517, Lot 40 on the Tax Map of the Township of Wayne, New Jersey. The eleven (11) acre property is located in a land use zone where a "house of worship" is a conditional use. This parcel is claimed by defendants to be defined by ordinance as "environmentally sensitive" because it consists almost entirely of rocky steep slopes. Plaintiffs dispute this contention, maintaining that the phrase "environmentally sensitive" is not defined by any Township ordinance. The property, which has always been undeveloped, was previously the subject of two variance applications, one for a residential subdivision in 1987 and the other by the North Haledon Nursing Home Association in April 1994. While the residential subdivision was granted, the variance sought by the North Haledon Nursing Home Associations was denied due to the Township Board of Adjustment's finding that "[t]he subject property is environmentally sensitive as defined by the Township Environmental [sic] containing steep slopes and soil consisting of bedrock within one and one-half feet of the surface and bedrock at the surface."

Defendants maintain that prior to plaintiffs' purchase of the subject property, in June 2001, mayoral hopeful, Scott Rumana, proposed an Open Space Plan as part of his campaign platform. According to campaign literature, Rumana, along with his campaign team, comprised of Councilman

2

Christopher Vergano, Councilman Joseph Schweighardt, and Councilwoman Harriet Rossi, pledged that "[f]or our future [they] will fight to preserve precious open spaces." On June 26, 2001, Rumana was elected as Mayor. It was only after this proposal was introduced that plaintiffs contracted to purchase and, on October 5, 2001, subsequently closed on the subject property.

On October 17, 2002, plaintiffs submitted a Land Development Application with a Site Plan to develop the property as a religious facility. Representatives for the Mosque first appeared before the Defendant Planning Board on March 24, 2003. Since that time, plaintiffs' application has been revised, withdrawn, and resubmitted for several reasons including environmental issues regarding storm water management, height and fencing requirements, parking issues, and traffic concerns. Because the property is located between two county roads, the County of Passaic also retained jurisdiction to review and approve the plan for storm water drainage.

In November 2003, nearly two and a half years after the open space proposal was first introduced, and while plaintiff's site plan application remained pending before the Defendant Planning Board, the Township residents voted to approve the Open Space Referendum, which would put aside a portion of resident tax dollars to purchase and preserve open spaces. According to one councilman, the plaintiff's application to build its Mosque was one of the reasons that the entire Open Space Referendum was put on the ballot. Following voter approval, an Open Space Committee was formed on January 1, 2004, with the Mayor chairing the Committee. It is an ad hoc committee. The Committee, which retains no binding authority or voting power, was assembled solely to identify properties to be preserved for open spaces to the Township Council.[1] The

---

[1] If this is true, then the Committee may not be subject to some important procedural safeguards against arbitrary municipal action such as the Open Public Meeting Act. The Court can not determine same from the record before it.

Referendum charged the Committee with submitting a "prioritized list of properties to be acquired and/or properties from which development rights should be acquired" to the Council. Only after such a list had been compiled by the Committee and approved by the Council is the Council empowered to acquire any property for open space purposes. The Committee, however, never submitted a prioritized list of properties to be acquired, but rather provided a list of all undeveloped land in the Township. Certainly, with no intention of acquiring all open space in the Township, plaintiffs maintain, and the mayor admitted at his deposition, that the Committee pursued properties on an individualized property-by-property basis.

Defendants claim that at the third meeting of the Open Space Committee, on May 20, 2004, the subject property was identified as a candidate to be preserved. The record is void of any indication if or when the Township notified the Mosque that its property was subject to the Open Space Initiative. Plaintiffs, however, argue that nowhere in the minutes of the Open Space Committee was there a recommendation to acquire the Mosque's property. In fact, at the first two meetings of the Committee, there was no mention of the plaintiffs' property. While the Mosque's property was mentioned at the May 20, 2004 meeting, plaintiffs argue that it was never identified as a candidate or recommended for open space. At that meeting, according to plaintiffs, the Committee discussed the priorities for acquisition and listed other properties for acquisition.

On March 14, 2005, a public hearing was held where the Planning Board adopted the Open Space and Recreation Plan, which provided that "[a] preservation plan for the remaining undeveloped and environmentally sensitive parcels located within the Township is required in order to preserve those final tracts that, if developed, would severely impact the future quality of life of the Township's residents."

On January 18, 2006, the Council held a closed session meeting to discuss the subject property.[2] The exact subject matter of the session has been held privileged.[3] Plaintiffs maintain that it was at this closed meeting that defendants decided on the acquisition of the subject property. Believing that it had the requisite legal grounds to acquire the property via eminent domain, the plaintiffs' property was the subject of discussion at a January 26, 2006 Committee meeting. Plaintiffs contend that the mayor simply informed the Committee at this January 26, 2006 meeting that the Township was acquiring the property. On April 5, 2006, the Township passed Resolution 139 in furtherance of the Open Space and Recreation Plan, authorizing an appraisal report of the plaintiffs' property for use in condemnation proceedings. Defendants maintain that the Council focused only on the environmentally sensitive nature of the property and the fact that a development application was pending. According to defendants, the proposed structure and use had no bearing on the Council's decision.

Defendants point to the deposition testimony of several members of the Council to establish that the decision to acquire the property was not motivated by an improper purpose. Councilman Christopher Vergano testified that "it wasn't about them. It was the 10 acres of property. It could have been Our Lady of Consolation that owned the property. It wouldn't have mattered." Councilman Gerald Porter suggested that none of the members of the Council even knew the

---

[2] Prior to this meeting, defendants state that Mayor Rumana read the New Jersey Appellate Division's opinion in *Mt. Laurel Township v. Mipro Homes*, LLC, 379 N.J. Super. 358 (App.Div.), *affirmed by*, 188 N.J. 531 (2006), a ruling heavily relied upon by this Court in granting plaintiffs' motion for a preliminary injunction in November 2006, one month prior to the New Jersey Supreme Court's opinion affirming the decision.

[3] Following an *in camera* review of the minutes of the January 18, 2006 meeting, the Magistrate Judge found the minutes to be irrelevant, not discoverable, and subject to the attorney-client privilege. The parties did not appeal that decision.

property belonged to plaintiffs.  ("They didn't tell me it was the Albanian's or anything.  None of us knew that.").  Councilwoman Ann Mary O'Rourke offered the following:

> Did I look at it having implications for the free exercise of religion?  No, because at that time we were looking into the possibility of acquiring the property, so I did not look at it at all as being something where we were infringing on somebody's exercise of religion.  I would look at it as if it was any organization, corporation, or anything at that point because it was just looking into the possibility of acquiring it.

Councilman Mario Ianelli testified that his decision had "nothing to do with the application being for a Mosque and everything to do with it being developed."  Likewise, Councilman Benedict Martorana stated that "[t]he nature of the land use wasn't important, just the impacts on the land.  There was no concern about the proposed use, no discussion on the proposed use, whether that was of any concern at all to the Committee."  Councilmen Alan Purcell, Joseph Schweighardt, and Joseph Scuralli each testified that their decision to vote in favor of acquiring the land centered around the environmental concerns about the property.  Councilman Joseph DiDonato stated that he voted to acquire the property because of flooding and parking conditions.

The Township offered plaintiffs compensation in the amount of $510,000.  Additionally, according to the Township, alternative locations were suggested within the Township upon which plaintiffs may want to build its Mosque.  Plaintiffs rejected the monetary compensation and found the alternative sites suggested by the Township to be unavailable.  The Township advised plaintiffs that it would initiate condemnation proceedings.

On July 17, 2006, the Mosque filed the instant Verified Complaint and thereafter moved for a preliminary injunction seeking to "enjoin the defendants from taking any action under powers of eminent domain or otherwise interfering with plaintiffs' quiet enjoyment of their property...pending

final disposition of this action." On November 1, 2006, the Court heard the motion for a preliminary injunction. In the course of that hearing, it was made apparent that despite approximately 102 properties identified for the Open Space and Recreation Plan, only the plaintiffs' property was being pursued through condemnation. As a result, the Court granted a preliminary injunction enjoining defendants from taking any action under powers of eminent domain pending final disposition of this action.[4] After postponing several scheduled hearings in which the Court sought testimony to determine whether the preliminary injunction should continue, the parties agreed to keep the injunction in place while the Court considered dispositive motions. Defendants filed a motion for summary judgment and plaintiffs have moved for partial summary judgment. The United States of America, Department of Justice, Civil Right Division, Housing and Civil Enforcement Section, was granted leave to file a brief as *amicus curiae*, which was submitted solely in support of plaintiffs' claim under RLUIPA, Section 2(b)(2).

***Discussion*:**

I.

At the outset, notwithstanding the extensive briefing, what is obvious from oral argument and a settlement conference is that the parties bitterly dispute the facts. Accordingly, the Court can not render a decision on the motions because of these factual and credibility issues which this Court can better judge through trial. These disputes include, but are not limited to:

a)      whether reasonable alternative sites exist;

---

[4] In defendants' motion papers, defendants identify other property that the Township has acquired, namely the St. Joseph's/Sunrise Assisted Living property, the Solari property, and the Van Houten Burroughs property. Defendants made no mention as to when these properties were acquired or by what means.

b)        when and how the Mosque parcel was deemed "environmentally sensitive" and subject to eminent domain proceedings, or whether it was a method to quell community opposition to the development of the Mosque; and

c)        whether the condemnation actually is a burden on the exercise of religion by members of the Mosque.

"Eminent domain is the power of the State to take private property for public use...It is a right founded on the law of necessity which is inherent in sovereignty and essential to the existence of government[.]" *Township of W. Orange v. 769 Assocs.*, 172 N.J. 564, 571 (2002) (quoting *State v. Lanza*, 27 N.J. 516, 529 (1958)). "Generally, a government entity may take, or condemn, private property where it is essential for public use, and where just compensation has been made to the owner." *Borough of Essex Fells v. Kessler Inst. for Rehab.*, 289 N.J. Super. 329, 336 (Law. Div. 1995).

The issue of "open space" and a municipality's motive in selecting properties for open space was addressed by the Appellate Division of the Superior Court of New Jersey in *Mount Laurel v. Mipro Homes, LLC*, 379 N.J. Super. 358 (App. Div. 2005). In that case, Mount Laurel had adopted an Open Space Recreation Plan, creating a list of properties sought to be acquired. *Id.* at 364-65. Not included on the list was a 16.3-acre parcel which had been approved for an assisted living facility that included units affordable to low- and moderate-income residents. *Id.* at 365-66. In 2001, MiPro[5] purchased the site and altered the plans in order to construct 23 single-family

_____

[5] Although the Appellate Division repeatedly referred to the appellee as "Mipro," in a footnote in the dissenting opinion to the New Jersey Supreme Court's opinion affirming the Appellate Division's ruling, Justice Rivera-Soto explained that "MiPro's written submissions all capitalize the 'p' in MiPro, and both the majority and I have adopted that convention." *MiPro Homes*, 188 N.J. at 535 n.1.

8

residences on the property.  *Id.* at 366.  Upon realization of the proposed use, Mount Laurel's governing body added the site to the list of parcels to be acquired under its open space acquisition program.  *Id.* at 366.  Following unsuccessful attempts to acquire the site by voluntary acquisition, Mount Laurel brought a condemnation action.  In challenging the municipality's actions, MiPro argued that the condemnation was an effort to thwart residential development which was an unlawful purpose in exercising the power of eminent domain.  *Id.* at 367.  Despite finding that the municipality had no plan to devote the property to active recreational use, the Appellate Division held that:

> a municipality has statutory authority to condemn property for open space;...the selection of properties for open space acquisition on which residential development is planned does not constitute an improper exercise of the eminent domain power; and that Mipro did not present evidence that could support a finding that Mount Laurel's decision to condemn its property constituted an abuse of the eminent domain power.

*Id.* at 368.

In so holding, the court indulged an extensive overview of the idea of "open space."  The court's historical recitation provided that "[o]ur Legislature has long recognized that preservation of open space constitutes a public use, and therefore municipalities may utilize the eminent domain power to acquire property for this purpose.  As early as 1917, the Legislature enacted the 'Home Rule Act,' L. 1917, c. 152, art. XXXVI, § 1, now codified in *N.J.S.A.* 40:61-1, which provides that a municipality may acquire property for 'open spaces' by exercise of the power of 'condemnation.'"  *Id.* at 371.

The significance of *Mipro*, in the context of this case, is that the plaintiff there argued that although the condemnation was for a facially valid purpose, such action was improper because the

motivation in bringing the condemnation action was to prevent MiPro's proposed residential development. In response, the court explained that "[i]t is well-established that a reviewing court will not upset a municipality's decision to use its eminent domain power in the absence of an affirmative showing of fraud, bad faith or manifest abuse." *Id.* at 375 (citing *Township of West Orange*, 172 N.J. at 571 (quoting *City of Trenton v. Lenzner*, 16 N.J. 465, 473 (1954), *cert. denied*, 348 U.S. 972 (1955)) (internal quotations omitted).

> Bad faith is referred to as the doing of an act for a dishonest purpose. The term also "contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." *Borough of Essex Fells v. Kessler Institute for Rehab.*, 289 N.J.Super. 329, 338 (Law. Div. 1995), citing *Lustrelon Inc. v. Prutscher*, 178 N.J.Super. 128, 144 (App. Div. 1981). The party making the claim that the government has conducted itself in bad faith or in a fraudulent manner has the burden of proof. Furthermore, evidence showing that the government acted in bad faith must be clear and convincing. Only then will the condemnation be set aside.

*Essex County Improvement Auth. v. RAR Dev. Assocs.*, 323 N.J. Super. 505, 515-16 (Law. Div. 1999).

The *Mipro* Court further stated that "[c]ourts will generally not inquire into a public body's motive concerning the necessity of the taking..." *Mipro Homes*, 379 N.J. Super. at 375 (quoting *Borough of Essex Fells*, 289 N.J. Super. at 337). Because the court found the condemnation action was brought for a legitimate public purpose and, further, not motivated by some discriminatory or improper reason, the general rule to not inquire into a governing body's motive concerning the taking applies. *Id.* at 377.

The court, however, suggested that where there has been an "affirmative showing of fraud, bad faith or manifest abuse" or indication of a discriminatory or improper purpose, the general rule

becomes inapplicable and motive may be inquired.  While finding the municipality's reasoning sound, the court theorized that had Mount Laurel attempted to condemn the property of MiPro's predecessor, which planned an assisted living facility, a finding of abuse of eminent domain power might have been warranted.  *Id.* at 376-77.

In order to set aside the condemnation action, the plaintiffs bear the burden of proving fraud, bad faith, or manifest abuse by clear and convincing evidence. *Gloucester County Improvement Authority v. Shoemaker*, 2006 WL 2096069, at *5 (App. Div. July 31, 2006) (citing *Essex County Improvement Auth.*, *supra*, 323 N.J.Super. at 515-16; *Borough of Essex Fells*, *supra*, 289 N.J.Super. at 342).

Therefore, the issue is whether defendants can demonstrate that plaintiffs cannot, as a matter of law, establish by clear and convincing evidence that the taking for open space is pretext for discrimination or whether questions of material fact exist sufficient to overcome the motion for summary judgment.  Taking a more narrow approach,  plaintiffs here must demonstrate an "affirmative showing of fraud, bad faith or manifest abuse" or indication of a discriminatory or improper purpose so as to inquire into the motive behind the condemnation.  Certainly, the deposition testimony of the council members, for the most part, is facially innocent.  However, at the summary judgment stage, the Court may not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998); *see also Gulley v. Elizabeth City Police Dept.*, No. 04-4445, 2006 WL 3694588, at *8 (D.N.J. Dec. 13, 2006) ("[I]n adjudicating a motion for summary judgment, the Court is not at liberty to make such credibility determinations.").

11

The circumstances of this case and the manner in which the plaintiffs' property was pursued, at the very least, supports an indication of discriminatory or improper purpose for which plaintiffs are entitled to inquire into the Council's motives in condemning the plaintiffs' property and raise the issue of credibility before the trier of fact.

II.

The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et. seq. ("RLUIPA"), "has two particular provisions at issue in this case. First, the RLUIPA has a substantial burden provision that requires land-use regulations that substantially burden religious exercise to be the least restrictive means of advancing a compelling governmental interest. Second, the Act has a nondiscrimination provision, which prohibits land-use regulations that disfavors religious uses relative to nonreligious uses." *Lighthouse Institute for Evangelism v. City of Long Branch*, 406 F. Supp. 2d 507, 514 (D.N.J. 2005). The section of the RLUIPA relating to land use regulations establishes a "general rule" that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly or institution (A) is in furtherance of a compelling government interest; and (B) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc(a)(1).

This "general rule" is carefully circumscribed to apply only to cases in which: (A) the substantial burden is imposed on a program or activity that receives Federal financial assistance, even if the burden results from a rule of general applicability; (B) the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several

12

States, or with Indian tribes, even if the burden results from a rule of general applicability; or (C) the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved. *Church of Hills of Twp. of Bedminster v. Twp. of Bedminster*, No. 05-3332, 2006 WL 462674, at *3 (D.N.J. Feb. 24, 2006) (citing 42 U.S.C. § 2000cc(a)(2)).

A.

Defendants argue that the Court need not inquire as to any substantial burden, much less a compelling interest, because the RLUIPA does not apply to takings.  In *Faith Temple Church v. Town of Brighton*, 405 F. Supp. 2d 250 (W.D.N.Y. 2005), the District Court for the Western District of New York held that a town's eminent domain proceedings did not constitute a "land use regulations" for purposes of the RLUIPA.

> Faith Temple does not appear to contend ... that the Town's condemnation of the Groos parcel would involve a "landmarking law."  Landmarking laws generally involve the "regulat[ion] and restrict[ion of] certain areas as national historic landmarks, special historic sites, places and buildings for the purpose of conservation, protection, enhancement and perpetuation of these places of natural heritage."  Nothing of that nature is involved here.   The eminent domain proceedings here also do not amount to a "zoning law" or "the application of such a law."

> * * *

> Given these differences between zoning and eminent domain, it seems very unlikely that Congress assumed that courts would interpret RLUIPA's reference to zoning laws as including eminent domain proceedings as well. The simple fact is that Congress chose to limit the application of RLUIPA to cases involving "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land...."  Conspicuously

> absent is any mention of eminent domain.  Eminent domain is hardly
> an arcane or little-known concept, and the Court will not assume that
> Congress simply overlooked it when drafting RLUIPA.

*Id.* at 254-55 (citation omitted).

The District Court for the Northern District of Illinois held that Chicago's proposed expansion of O'Hare airport did not implicate the RLUIPA because, *inter alia*, the city's authority to acquire the land did not stem from a zoning regulation or landmarking law.  *St. John's United Church of Christ v. City of Chicago*, 401 F. Supp. 2d 887, 899 (N.D.Ill. 2005).  The RLUIPA only applies to government actions that "impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person." 42 U.S.C. § 2000cc.  The term "land use regulation" is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land...." 42 U.S.C. § 2000cc-5(5).  "In [*St. John's United Church of Christ*] the City is seeking to exercise eminent domain power.  Nothing in the . . . complaint leads to the inference that the City's authority to acquire the land stems from any zoning regulations or landmarking law."  *St. John's United Church of Christ*, 401 F. Supp. 2d at 899.

> Land use regulations limit the use of property. Condemnation is, in
> one sense, the ultimate limitation on the use of property. It does not
> follow, however, that condemnation is a land use regulation as this
> term is used in the statute. Congress could have included "takings"
> within the reach of RLUIPA but did not. This Court is no [sic]
> persuaded that it should construe the concept of zoning so broadly
> that any acquisition of land by the City pursuant to eminent domain
> proceedings is an act of zoning.
>
> ****
>
> It is important to note that this Court's holding that the City does not
> act pursuant to a zoning or landmarking law should not be taken to

14

mean that all condemnation proceedings necessarily are outside the scope of RLUIPA. This Court expresses no opinion with respect to that conclusion.

*Id.* at 900.

Plaintiffs rely principally on *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F. Supp. 2d 1203 (C.D.Cal. 2002), for the proposition that eminent domain proceedings are within the context of the RLUIPA.  However, the Court does not reach this question because, as indicated in the Court's oral decision on the motion to dismiss, and reiterated in plaintiffs' opposition brief, the RLUIPA challenge does not go to the actual taking, but rather the implementation of the open space plan which is a land use regulation. The taking is merely a method of implementation.  The open space plan, in the Court's opinion, is clearly a "land use regulation" within the meaning of the statute.  The plan, which by defendants' own admission created "[a] preservation plan for the remaining undeveloped and environmentally sensitive parcels located within the Township...to preserve those final tracts...," is a "landmarking law, or [] application of such a law, that limits or restricts a claimant's use or development of land."[6]

### B.

"To prevail under the substantial burden prong of the RLUIPA, plaintiffs must demonstrate that the regulation at issue actually imposes a substantial burden on religious exercise."  *Lighthouse Institute for Evangelism*, 406 F. Supp. 2d at 515.  The RLUIPA does not define the term "substantial burden," but in a recent precedential Third Circuit opinion, the court established a definition of

---

[6] The United States submits that there are genuine issues of material fact concerning the Township's motivations to take the Mosque's property while the Mosques conditional use permit application was pending.  Moreover, because there is evidence to support the conclusion that the challenged discrimination arises from the implementation or imposition of a land use regulation triggering, the government argues that summary judgment should be denied.

15

"substantial burden" for purposes of RLUIPA by adopting "a disjunctive test that couples the holdings of *Sherbert* and *Thomas*."[7]  *Washington v. Klem*, No. 05-2351, at 15 (3d Cir. 2007) (A Pennsylvania Department of Corrections restriction on the number of books inmates could have in their cells substantially burdened an inmate's religious exercise because he was required to read four books a day about the African people and then proselytize the learning; such restriction was not the least restrictive means to further a compelling government interest.).   Under *Washington*, a substantial burden will exist where:

> 1)  a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; OR 2) the government puts  substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs.  *Id.*

Under the non-precedential Third Circuit view used prior to *Washington*, a substantial burden was one that "necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."  *Lighthouse Inst. for Evangelism, Inc. v. City of Long Beach*, 100 F. Appx. 70, 77 (3d Cir. 2004) (quoting *Civil Liberties for Urban Believers*

---

[7] Under the *Sherbert* view, a substantial burden exists where a person is required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion ... on the other hand."  *Sherbert v. Verner*, 374 U.S. 398, 404 (1963).  Under *Thomas v. Review Bd. of the Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981), there is a substantial burden when the state "put[s] substantial pressure on an adherent to modify his behavior and violate his beliefs."  The *Washington* court praises the Fifth Circuit in *Adkins* for combining these two tests and thus decides to emulate that decision. *Washington*, No. 05-2351, at 15 n.7, *referring to Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) ("a government action or regulation creates a 'substantial burden' on a religious exercise if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.").

(*C.L.U.B.*) *v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003), *cert. denied*, 541 U.S. 1096 (2004)), *cert. denied*, 543 U.S. 1120 (2005).

The standard adopted by the *Washington* court was in the context of the "Institutionalized Persons" provision of RLUIPA; although the court appears to adopt this standard "[f]or the purposes of RLUIPA," and thus would apply the standard even to the Land Use provision, the standard enunciated in the opinion specifically mentions *inmates*, which makes it unclear as to whether this same standard actually does apply to the rest of the RLUIPA sections.  What is clear, however,  is that establishing a substantial burden under either standard requires more than merely inhibiting or constraining any religious exercise.   Thus, the Court does not answer the question as to the applicability of *Washington*, because under both the *Washington* standard and the *Lighthouse* standard, the result will be the same.

Defendants argue that requiring plaintiffs to find property within the Township that is not the subject property does not amount to a substantial burden.  See *Lighthouse Institute for Evangelism*, 406 F. Supp. 2d at 515 ("Here, the circumstance that the Ordinance and Redevelopment Ordinance require plaintiffs to find a location outside the narrowly drawn Broadway Redevelopment Zone, simply does not amount to a substantial burden.").  However, in *Lighthouse*, the court found that "[t]here is evidence which demonstrates that suitable alternative venues are available . . . in 90% of the rest of the City . . ."  While defendants assert that "there is absolutely no evidence here to demonstrate that there were not suitable venues in Wayne," it appears to the Court that there are

disputed facts as to whether alternative sites are available or are affordable.  One such parcel, identified by the Township, was found not to be for sale.[8]

It is also argued that plaintiffs cannot establish a substantial burden because it operated and continues to operate its house of worship in the Paterson facility.  However, over the past 22 years, the Mosque's congregation has grown from fewer than 100 individuals to over 200 families. "Churches and synagogues cannot function without physical space adequate to their needs and consistent with their theological requirements.  The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes." *Mintz v. Roman Catholic Bishop of Springfield*, 424 F. Supp. 2d 309, 312 (D. Mass. 2006) (quoting 146 Cong. Rec. S. 7774-5 (July 27, 2000)).  The fact that the plaintiffs continue to utilize its inadequate facility (i.e., no room for religious education; female members of the Mosque are unable to attend prayer sessions because of space limitations; female members cannot see the Imam, which is the proper method for Muslim prayer; female members cannot perform "abdest" ritual washing before prayers because of lack of facilities), does not, *per se*, render any burdens placed upon plaintiffs by defendants insubstantial.  The *Washington* decision is also instructive in this case.  The Third Circuit held that, despite the existence of a supposed "palatable alternative" for his religious practice of reading four new books a day (i.e. reading in the library once a week or simply using fewer books), the inmate plaintiff's right to practice his religion was still substantially burdened by the book limitation. *Washington*, No. 05-2351 at 18-19.  Similarly, just because Plaintiffs in this case can

---

[8]  Three other properties suggested by the town planner were being developed or had development applications pending before the planning board.  None of the properties suggested were on the market.

practice some aspects of their religion in the Paterson facility does not mean there is no substantial burden on their religious exercise.

The fact finder could reasonably determine that the Township's actions have created a substantial burden on the Mosque. From the facts before the Court, such a holding cannot be made as a matter of law.

## C.

The RLUIPA contains two subsections under subpart (b). Subsection (b)(1) is the "Equal Terms" provision, which indicates that the government shall not "impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." Subsection (b)(2), "Nondiscrimination," prohibits the government from imposing or implementing "a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."

RLUIPA subsection (b)(1), the "Equal Terms" provision, "codifies existing Free Exercise, Establishment Clause and Equal Protection rights against states and municipalities that treat religious assemblies or institutions 'on less than equal terms' than secular institutions," and thus subsection (b) is constitutional under section 5 of the Fourteenth Amendment. *Midrash Sephardi, Inc., v. Town of Surfside*, 366 F.3d 1214, 1239 (11th Cir. 2004); *Freedom Baptist Church v. Twp. Of Middletown*, 204 F. Supp. 2d 857 (E.D. Pa. 2002). Furthermore, under *Cleburne*, since the Equal Protection Clause of the Fourteenth Amendment "essentially [directs] that all persons similarly situated should be treated alike" and Congress is empowered by section 5 to "enforce this mandate," the "similarly situated" analysis becomes an essential part of the RLUIPA analysis. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (U.S. 1985).

Although the Plaintiff's complaint alleges only a violation of subsection (b)(2) ("Nondiscrimination") and does not mention (b)(1) ("Equal Treatment"), the Third Circuit, unlike some other circuits,[9] appears to treat the two subsections as both incorporating the "similarly situated" analysis. *See Lighthouse Institute for Evangelism, Inc. v. City of Long Branch*, 406 F. Supp. 2d 507 (D.N.J. 2005); *Lighthouse Institute for Evangelism v. City of Long Branch*, 100 Fed. Appx. 70, 77 (3d Cir. 2004).[10]

Defendants argue that "[i]t is undisputed that the [plaintiffs have] identified no similarly situated applicants who were treated more favorably." However, plaintiffs point to defendants granting permission to develop land that is deemed 'environmentally sensitive' on 32 of 34 waiver applications since the enactment of the open space plan.[11] Plaintiffs argue that defendants "continue to allow development on other parcels of land that have steep slopes, wetlands, rocky areas, and other factors that the Township claims to want to protect under its Open Space Plan."

---

[9] *See, e.g. Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1230 (11th Cir. 2004) (noting that the district court below assumed that the "similarly situated" analysis applies to subsection (b), but holding that a "natural perimeter" approach was more relevant, and that the "district court erred by not considering RLUIPA's statutory categorization as the relevant 'perimeter'").

[10] The *Amicus curiae* brief submitted by the United States takes the position that Sections 2(a) and 2(b) of the RLUIPA operate independently and that a plaintiff need not show a substantial burden to prove the requirements for a violation of section 2(b). However, the *Lighthouse* court has indicated otherwise. The court noted that "[g]iven the legislative history, it seems clear that Section (a)'s 'substantial burden' test is applicable to the more precise provisions in Section (b). . . . As such, plaintiffs' failure to demonstrate a substantial burden under Section (a) is fatal to his claims under Section (b)." Because this Court, as explained above, cannot find that Plaintiffs lack a substantial burden as a matter of law under Section (a), it will not dismiss its claims under Section (b).

[11] Plaintiff's application does not require a waiver of the Environmental Protection Ordinance.

20

More telling, however, is the treatment of the St. Joseph Catholic Hospital's property.  The owners of this lot of approximately 23 acres submitted an application for a zoning change to allow it to sell some property to a private developer in order to construct age-restricted housing on the property.  Finding the property to be environmentally sensitive in light of the rocky terrain, steep slopes, and wetlands, the Open Space Committee recommended its acquisition and the Township Council agreed.  However, the Township did not acquire all 23 acres, but rather entered into a deal with St. Joseph Catholic Hospital to convey most of the property to the Township while separating a portion for the hospital to build an office building.  Additionally, the hospital was granted a zoning change for a parcel the hospital owned across the street, so that age-restricted housing could be built on that parcel.

In this case, defendants are seeking to take plaintiff's entire 11-acre parcel, despite the Township's own estimate that between eight and nine acres would remain open even if plaintiffs were permitted to build their Mosque and religious education building on the property.

In light of these facts, plaintiffs have submitted sufficient evidence identifying potentially similarly situated applicants being treated differently from plaintiff to raise a triable issue of material fact and thus to preclude summary judgment[12] on the nondiscrimination provision of the RLUIPA.[13]

_____

[12]  The Court has insufficient evidence before it to determine whether plaintiffs' lack of expert testimony precludes its demonstration of similarly situated applicants.

[13]  As noted by the *Lighthouse* court, there is "a question as to the proper test under section (b) once the parties have established that similarly situated entities are being treated differently."  *Lighthouse*, 406 F. Supp. 2d at 518 n.5.  The court continued, "[i]f section (b) was meant to codify the existing equal protection analysis, then a party need only establish a rational basis for the different treatment.  However, if section (b) retains the more strict test of section (a), then parties must demonstrate a compelling interest that is the least restrictive means."  *Id.*  The Court declines to decide this issue as the plaintiff has already demonstrated a triable issue of fact on the "similarly situated" analysis to survive summary judgment and thus the issue is moot for

Given this issue of fact on the RLUIPA claim, the Court need not address whether plaintiff was actually discriminated against (i.e., analyzing the Township's intent to determine if their actions were discriminatory); such question is left for the factfinder.

### III.

The First Amendment, which is applicable to the States pursuant to the Fourteenth Amendment, provides that "Congress shall make no law...prohibiting the free exercise [of religion]." U.S. Const. amend. I; *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). This First Amendment protection of the free exercise of religion provides the "right to believe and profess whatever religious doctrine one desires," and does so by prohibiting "all 'governmental regulation of religious beliefs as such.'" *Employment Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1989) (citing *Sherbet v. Verner*, 374 U.S. 398, 402 (1963)), *superseded by statute on other grounds*, 107 Stat. 1488, 42 U.S.C. § 2000bb (1993).[14] "[T]he 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts." *Id.* When performance of or abstention from certain acts as an exercise of religion comes into conflict with a law or other

_____

purposes of this decision.

[14] *Smith* stood for the proposition that "the First Amendment's Free Exercise Clause does not inhibit enforcement of otherwise valid laws of general application that incidentally burden religious conduct." *Cutter v. Wilkinson*, 544 U.S. 709, 714 (2005). Congress responded to *Smith* by passing the Religious Freedom Restoration Act ("RFRA") of 1993, which prohibited the government from "'substantially burdening' a person's exercise of religion even if the burden results from a rule of general applicability unless the government can demonstrate the burden '(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Id.* at 714-15 (citing *City of Boerne v. Flores*, 521 U.S. 507, 515-16 (1997)). The Supreme Court, in *City of Boerne*, invalidated RFRA "as applied to States and their subdivisions, holding that the Act exceeded Congress' remedial powers under the Fourteenth Amendment." *Id.* at 715 (citing *City of Boerne*, 521 U.S. at 532-36). Congress then went on to pass the more narrowly focused RLUIPA.

government action, the free exercise analysis is dependent upon the nature of the challenged law or government action, prompting either strict scrutiny or rational basis review. *Smith*, 494 U.S. at 879; *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); see also *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165-66 (3d Cir.2002) (discussing application of Free Exercise Clause). The framework for this analysis is delineated by two Supreme Court decisions: *Smith*, 494 U.S. 872 (1989) and *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).

In *Smith*, members of the Native American Church, who ingested peyote for ceremonial purposes, challenged Oregon's general criminal prohibition of the use of peyote. *Smith*, 494 U.S. at 878-79. The Supreme Court held that, as a general proposition, a law that is neutral and of general applicability need not be justified by a compelling governmental interest to avoid violating the Free Exercise Clause, even if the law has the incidental effect of burdening a particular religious practice. *Lukumi*, 508 U.S. at 531 (discussing *Smith*, 494 U.S. at 879). Later, in *Lukumi*, the Supreme Court found that "if the law is not neutral (i.e., if it discriminates against religiously motivated conduct) or is not generally applicable (i.e., it proscribes particular conduct only or primarily when religiously motivated), strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest." *Tenafly Eruv Ass'n*, 309 F.2d at 165 (citing *Lukumi*, 508 U.S. at 532, 546).

The *Smith* court noted two exceptions to the general rule that religiously neutral laws of general applicability do not violate the Free Exercise Clause. First, the Court recognized that a law which was neutral and general in its terms and applicability, but was nevertheless deliberately enacted to impact some religious practice, would still be subjected to strict scrutiny. *Smith*, 494 U.S.

23

at 877-78.  Second, the Court mentioned, in dictum, that the "only decisions in which we have held that the First Amendment bars application of a neutral, generally applicable law to religiously motivated action," were ones which "involved not the Free Exercise Clause alone, but the Free Exercise Clause in conjunction with other constitutional protections, such as freedom of speech and of the press . . ." *Id.* at 881.  This exception has come to be known as the "hybrid rights" exception.

In analyzing plaintiffs' claim under the Free Exercise Clause, "if the law is not neutral (i.e., if it discriminates against religiously motivated conduct) or is not generally applicable (i.e., it proscribes particular conduct only or primarily when religiously motivated), strict scrutiny applies and the burden on religious conduct violates the Free Exercise Clause unless it is narrowly tailored to advance a compelling governmental interest." *Tenafly Eruv Ass'n*, 309 F.2d at 165 (citing *Lukumi*, 508 U.S. at 532, 546).  "Neutrality and general applicability are interrelated, and...failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Lukumi*, 508 U.S. at 531.

In determining neutrality, "if the object of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533.  In analyzing the object of a law, the evaluating court begins with the text to examine whether the law is discriminatory on its face.  As "[f]acial neutrality is not determinative," the court then looks to the "effect of a law in its real operation," although "adverse impact will not always lead to a finding of impermissible targeting."  *Lukumi*, 508 U.S. at 534, 535.  Evidence may be direct or circumstantial, including "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Lukumi*, 508 U.S. at 540 (internal citations omitted).

24

As to general applicability, "[a]ll laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." Plaintiffs argue that the Township's selection of land for open space is akin to a system of "individualized governmental assessment." In fact, the mayor himself testified that "[e]very single property that we have pursued has been on an individual property-by-property basis." In the typical situation, such assessments involve a discretionary exemption from a general requirement which the government "may not refuse to extend...to cases of 'religious hardship' without compelling reason." *Lukumi*, 508 U.S. at 537 (quoting *Bowen v. Roy*, 476 U.S. 693, 708 (1986)). "Thus, religious practice is being singled out for discriminatory treatment." *Id.* at 538 (citing *Bowen*, 476 U.S. at 722, and n. 17 (Stevens, J., concurring in part and concurring in result); *id.*, at 708 (opinion of Burger, C.J.); *United States v. Lee*, 455 U.S. 252, 264, n. 3 (1982) (Stevens, J., concurring in judgment)).

The Court notes that 101 other properties are listed on the Township's Open Space Inventory list. The list was not created in a prioritized fashion as required by the Referendum. Only four (4) properties were ultimately pursued, admittedly on an individualized basis. Discretionary exceptions that were granted to at least one of the properties, namely the St. Joseph Catholic Hospital property, described above, were not extended to the Mosque.

Given the standard for summary judgment, viewing all evidence in the light most favorable to the non-moving party and giving that party the benefit of all reasonable inferences, this Court cannot find that defendants are entitled to judgment as a matter of law. *Creque v. Texaco Antilles Ltd.*, 409 F.3d 150, 152 (3d Cir. 2005). In the Court's view, it cannot be said, as a matter of law, that the Mosque was not being singled out for discriminatory treatment.

IV.

Plaintiffs' motion for partial summary judgment asks the Court to find, as a matter of law, that the protection of open space is not a compelling governmental interest.  Defendants do not argue that whether a stated interest is "compelling" is determined by any one other than the Court.  In fact, there is a substantial amount of case law that establishes that such a determination is a matter of law to be decided by the Court.  *U.S. v. Hardman*, 297 F.3d 1116, 1127 (10th Cir.  2002) ("Whether something qualifies as a compelling interest is a question of law."); *Citizens Concerned About Our Children v. School Bd.,* 193 F.3d 1285, 1292 (11th Cir. 1999); *Concrete Works of Colo., Inc. v. City and County of Denver*, 36 F.3d 1513, 1522 (10th Cir. 1994); *Northern Contracting, Inc. v. State of Illinois*, No. 00 C 4515, 2004 WL 422704, at *24 (N.D.Ill. March 3, 2004) ("Whether there is evidence sufficient to support a finding that a race-conscious governmental action is supported by a compelling interest and is narrowly tailored is a question of law." citing *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000)).

Plaintiffs make clear, however, that its motion does not address whether the Township actually possesses these interest.  Thus, plaintiffs seek to have the Court hold that if, in fact, it should become known that the Township's interest are solely predicated on the protection of open space, such is not a compelling interest sufficient to survive strict scrutiny.

The Court need not rule in the abstract or make determinations based on plaintiffs' hypotheticals.  Should this matter proceed to trial, defendants will be provided a full opportunity to present their interests, and at the appropriate time, if necessary, this Court will determine whether a compelling interest has been demonstrated.

The motions are denied in their entirety.  A pre-trial conference is to be scheduled.

 s/*Peter G. Sheridan*              
PETER G. SHERIDAN, U.S.D.J.

October 1, 2007